**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Appeal from the U.S. Bankruptcy Court |
| | ) | Northern District of Indiana |
| BARRY G. RADCLIFFE, | ) | Chapter 7 No. 05-67516 |
|     Debtor. | ) | |
| | ) | |
| ********************************** | ) | |
| | ) | |
| BARRY G. RADCLIFFE, | ) | |
|     Appellee, | ) | |
| | ) | |
|     v. | ) | No. 2:07-CV-285 PS |
| | ) | |
| INTERNATIONAL PAINTERS AND | ) | |
| ALLIED TRADES INDUSTRY | ) | |
| PENSION FUND, | ) | |
|     Appellant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Appellee Barry G. Radcliffe owned and operated Glass Service, Inc.  As part of a labor agreement, Glass Service contributed to a union pension fund.  When the company became delinquent on its contributions in early 2004, Radcliffe signed a personal guarantee to pay Glass Service's contributions should the company default again.  Glass Service did default again, but Radcliffe turned out to be a four flusher; he didn't stand behind his personal guaranty and so he stiffed the fund.

The Appellant, International Painters and Allied Trades Industry Pension Fund, sued Radcliffe for breach of contract and ultimately received a default judgment against him.  Radcliffe promptly declared bankruptcy.  But just before doing so, he completed a request for his own pension benefits from International.  International agreed to pay Radcliffe's benefits, but informed him that it would first withhold payment and apply the amounts withheld to the substantial debt Radcliffe owed International by virtue of defaulting on the contributions.

Radcliffe's counsel responded that doing so would violate the automatic stay that took effect

upon Radcliffe's filing for bankruptcy.  International engaged in a little self help and withheld

payment nonetheless.  But it did nothing to clear its actions with the Bankruptcy Court.

Radcliffe filed a complaint to enforce the automatic stay and the Bankruptcy Court ruled in his

favor, ordering International to pay compensatory damages, interest, punitive damages, and

attorneys fees.  International now appeals.  The bankruptcy judge did not abuse his discretion

and so his decision is **AFFIRMED**.

## BACKGROUND

Radcliffe owned Glass Service, Inc., which was party to a collective bargaining

agreement with International.  As part of that agreement, Glass Service was to make

contributions to International, a multiemployer employee benefit pension plan.  In early 2004,

Glass Service became delinquent on its contributions.  In May 2004, Radcliffe executed an

installment promissory note as well as a personal guarantee committing to personally fulfill

Glass Service's contribution obligations should it default.  The guarantee obliged Radcliffe to

"pay all contributions, delinquencies and amounts specified in the [union contract], that [Glass

Service] owes to [International]" should Glass Service become delinquent again.  (DE 1-7 at 6

(quotation marks omitted).)[1]  Under the guarantee, if Radcliffe failed to fulfill his obligations he

would be "liable under the same terms, and to the same extent," as Glass Service for both

"contractual and statutory liabilities."  (*Id*. at 6.)

---

[1] For clarity, the Court will refer to the docket entries rather than the titles of the various
documents contained in those entries, with paragraph or page citations when necessary.  Where
the citation refers to attachments or exhibits for the entry, the specific document is denoted by a
hyphenated suffix.  The suffix indicates the specific document within the general docket number
(*i.e.,* "DE 1-__"), and is followed by the page or paragraph citation if required.

Glass Service apparently did default because on December 2004 International sued it and Radcliffe in federal court in Washington, D.C.  In April of the following year, the D.C. court entered a default judgment in favor of International against the defendants.  The "clear basis" of Radcliffe's liability to International was his failure to fulfill the personal guarantee – it was not an assertion of a breach of fiduciary duty by Radcliffe.  (*Id*.)  There is nothing in the complaint or judgment that even remotely references a breach of fiduciary duty.  Rather, it was simply a contract action based on the personal guarantee.  (*Id*. at 6-7.)

One month after the default judgment, Glass Service closed its doors permanently.  Thereafter, Radcliffe completed the paperwork to receive his own pension benefits from International.  He first submitted an application for benefits in September.  He then completed additional forms on October 6 and returned them to International on October 13.  The very same day Radcliffe returned the forms to International – October 13, 2005 – he also filed a Chapter 7 bankruptcy petition.  As part of his petition, Radcliffe listed International as a creditor with claims in the amount of $107,500.00.

On November 2, 2005, International sent Radcliffe a letter regarding his pension benefits.  It informed Radcliffe that his application for benefits had been approved and that he was entitled to a monthly payment of $2,473.00, but that he would not be receiving payments until the $74,946.47 debt he owed International from the default judgment had been paid.  Instead, International advised Radcliffe that it would be withholding his pension benefits and applying the amount of each payment to the debt he owed International.  International expressly and unilaterally rejected the notion that using Radcliffe's pension benefits to offset his debt was barred by the automatic stay.  Here's what International told Radcliffe in its letter to him:

3

As you have an outstanding personal debt to the Pension Fund, your monthly pension benefits will be offset against your debt to the Pension Fund until such time as the judgment has been satisfied or you reach the age of 65.  The offset of debts due International is allowed by Section 7.30(c) of the Pension Plan document and applicable case law.  See, e.g., *Coar v. Kazimir*, 990 F.2d 1413 (3d Cir. 1993).  As the debt exceeds the amount of your monthly benefit, you will not receive any actual payment.  However, as the money is being applied directly for your benefit to reduce your indebtedness, the Pension Fund will report the pension payments that are offset to pay the judgment and the payments will be treated by the IRS as a pension benefit paid to you.

This is an initial determination by the Pension Plan concerning an offset of amounts you owe the Pension Plan and Annuity Plan against benefits due you.  If you or any interested party disagree with this determination you or any interested party may file an appeal to the Trustees. . . .  The appeal must be filed within 60 days of the date of this letter and should set forth reasons why you contend the Plans [sic] determinations are not permissible, including any documentation substantiating your claim. . . .  **This decision will become final and binding in the absence of a timely appeal.**

We have received notice that you filed a Chapter 7 bankruptcy petition on October 13, 2005.  We believe that pension assets are not property of the bankruptcy estate under the bankruptcy law.  As a result, the offset of your pension benefits should not be affected by the bankruptcy.  If you or your bankruptcy counsel believes otherwise, let us know and we will re-examine this issue.

(*See* DE 1-9 at 7-8 (emphasis in original).)

Radcliffe's counsel responded to International's letter a little more than a week later.  (*Id.* at 10.)  In her letter, Radcliffe's counsel objected to International's proposed setoff, noting that she "fail[ed] to understand how [International is] entitled to collect on a pre-petition debt in violation of the automatic stay that is now in effect."  (*Id.*)  She then explained that Radcliffe would file a complaint if International did not provide an adequate legal basis for its action.

International ignored them; it didn't respond to the letter nor did it seek relief from the automatic stay.  Instead, it waited and forced Radcliffe to file an adversary complaint, which he did on December 7.  (DE 1-7 at 9.)  Although International requested relief from the stay in its

4

answer to the complaint, (DE 1-10 at 3-4), it waited until May 31, 2006 to file a motion for relief, (DE 1-24).

The Bankruptcy Court entered its initial order in the adversary proceeding on March 14, 2007.  (DE 1-16.)[2]  It then reconsidered the order, and entered a new one on July 19, which constituted its findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(a).  (DE 1-7 at 2.)  The Bankruptcy Court consolidated the issues raised in the adversary proceeding and the motion for relief from the stay and disposed of both in the July 19 order, which the Court expressly noted were "core proceedings" under 28 U.S.C. § 157(b)(2)(G) and (O).  (*Id.* at 2.)

The Bankruptcy Court narrowed the issues presented to two: first, whether International violated the automatic stay by not paying Radcliffe his pension benefits; and second, if it did, should the automatic stay be retroactively annulled or modified to allow International to set off Radcliffe's debts it.  (*Id.* at 11.)[3]  The Court concluded that International's actions did violate the automatic stay, and that the stay should not be annulled.  The Bankruptcy Court's analysis of both questions involved a deeper question regarding International's right to carry out a setoff under ERISA.  (*See id.* at 14.)  The Bankruptcy Court ultimately determined that International

_____

[2]  The Bankruptcy Court issued an order of discharge in Radcliffe's bankruptcy proceeding on January 30, 2006, (DE 1-23), and thus the automatic stay ceased on that day, *see* 11 U.S.C. § 362(c)(2)(C).  But it was replaced with the post-discharge injunction.  *See* 11 U.S.C. § 524(a)(2).  There is no claim that the post-discharge injunction has been violated.  (*See* DE 1-7 at 10.)

[3]  The Bankruptcy Court correctly pointed out that, because Radcliffe filed for bankruptcy protection on October 13, 2005, the case is governed by pre-BAPCPA law.  (DE 1-7 at 2 n. 3.)  As a result, § 362(h), the pre-BAPCPA statutory designation, governs this case.  (*See id.*)

5

could not offset Radcliffe's debt with his monthly pension benefits because that would violate ERISA's anti-alienation provision.  (*See id*. at 14-21.)  Thus, the Court held that International had indeed violated the automatic stay and that it was not entitled to relief.  The Court also determined that the violation was willful and awarded both compensatory and punitive damages.

International now appeals wide swaths of the Bankruptcy Court's decision.  It argues that Radcliffe lacks standing to enforce the automatic stay.  It also asserts that the setoff is valid under ERISA, and even if it is not, International's conduct did not amount to a willful violation of the automatic stay.  In addition, International also contests both the Bankruptcy Court's calculation of damages as well as its award of punitive damages.

The parties stipulated to the Bankruptcy Court's jurisdiction over the adversary proceeding.  (*See* DE 1-12 ¶29.)  The Bankruptcy Court held that the issues presented in this case constituted core proceedings under 28 U.S.C. § 157(b), (*see* DE 1-7 at 2), but to the extent they are not, the Bankruptcy Court nevertheless had jurisdiction pursuant to Local Rule 200.1 because of the parties' consent.  This Court therefore has jurisdiction under 28 U.S.C. §§ 158, 1331, and 1334.

## DISCUSSION

The standard for review of bankruptcy court decisions depends upon the issue being reviewed.  Findings of fact are upheld unless clearly erroneous, but legal conclusions are reviewed *de novo*.  *Marrs-Winn Co., Inc. v. Giberson Elec., Inc.* (*In re Marrs-Winn*), 103 F.3d 584, 589 (7th Cir. 1996).  *See also Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001).  Whether to allow a setoff  "lies within the sound discretion of the bankruptcy court," and district courts review the bankruptcy court's decision for abuse of discretion.  *Meyer*

*Med. Physicians Group, Ltd. v. Health Care Serv. Corp.* (*In re Meyer Med. Physicians Group, Ltd.*), 385 F.3d 1039, 1041 (7th Cir. 2004). *See also In re Matter of Williams*, 144 F.3d 544, 546 (7th Cir. 1998); *In re Matter of Boomgarden*, 780 F.2d 657, 660 (7th Cir. 1985).

In reviewing for abuse of discretion, this Court will reverse where a bankruptcy court's "decision is premised on an incorrect legal principle or a clearly erroneous factual finding, or when the record contains no evidence on which the court rationally could have relied." *In re Kmart Corp.*, 381 F.3d 709, 713 (7th Cir. 2004). *See also Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 767 (7th Cir. 2004). It matters not whether I disagree with the bankruptcy judge's decision so long as the decision is within the range of options from which one would expect a reasonable trial judge to select. *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 754 (7th Cir. 2002). It is for this reason that International faces a daunting challenge in trying to convince me that Judge Klingeberger abused his discretion. *Zhou v. Guardian Life Ins. Co. of Am.*, 295 F.3d 677, 679 (7th Cir. 2002).

As noted above, International takes issue with most of the Bankruptcy Court's order. I will first address International's standing arguments. I will then turn to whether International violated the automatic stay and, if so, whether the stay should be lifted. Finally, I will examine the appropriate damages.

## I.      STANDING

In deciding whether a party has standing to enforce an automatic stay, the Seventh Circuit generally relies upon the "pecuniary interest" rule. *Cult Awareness Network, Inc. v. Martino* (*In re Cult Awareness Network, Inc.*), 151 F.3d 605, 607-08 (7th Cir. 1998). Here, Radcliffe has such an interest because the pension benefits are not property of the estate. *See*

*Patterson v. Shumate*, 504 U.S. 753, 760 (1992) (benefits from ERISA-covered plan are

excluded from the bankruptcy estate under 11 U.S.C. § 541(c)(2) because of the restrictions

placed on them by ERISA). The parties also stipulated that Radcliffe's pension benefits do not

belong to the estate. (*See* DE 1-12 ¶28.) Because Radcliffe has a pecuniary interest here, he has

standing to assert a violation of the automatic stay.

　　Case law also supports standing to invoke a statute where the person invoking it is one

whom the statute is intended to protect. *See In re Matter of James Wilson Assocs.*, 965 F.2d 160,

168 (7th Cir. 1992). Radcliffe filed this adversary proceeding to enforce the automatic stay

under 11 U.S.C. § 362. Under § 362(h), "[a]n individual injured by any willful violation of a

stay," may recover for that violation. Because § 362(h) refers to an "individual" rather than a

particular party, its protections are not limited to the bankruptcy estate. Similarly, because the

benefits at issue here do not belong to the bankruptcy estate, the automatic stay's prohibitions

against actions "to collect, assess, or recover a claim against the debtor," 11 U.S.C. § 362(a)(6),

is intended to protect Radcliffe, not his bankruptcy estate. Therefore, Radcliffe has standing to

invoke § 362(h) in this case. *See Advanced Ribbons & Office Prods., Inc. v. U.S. Interstate*

*Distrib., Inc.* (*In re Advanced Ribbons & Office Prods., Inc.*), 125 B.R. 259, 263 (B.A.P. 9th Cir.

1991) (noting that a debtor has standing to assert a violation of § 362(a)(6) because it "protects a

debtor from post-petition acts of collection"). *See also Ford Motor Credit Co. v. Hemsley* (*In re*

*Bennett*), 317 B.R. 313, 316-17 (Bankr. D. Md. 2004); *McCready v. eBay, Inc.*, No. 03 C 1589,

2004 WL 626142, at *1 (N.D. Ill. Mar. 29, 2004) ("Statutory language and relevant case law

establish that an individual debtor may recover damages for willful violation of the automatic

stay.").

## II.      WAS THERE A VIOLATION OF THE AUTOMATIC STAY?

An "automatic stay" takes effect immediately upon the filing of bankruptcy protection.

11 U.S.C. § 362(a).  *See also In re Matter of Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1231 (7th

Cir. 1990).  The stay "is a statutory injunction against efforts outside of bankruptcy to collect

debts from a debtor who is under the protection of the bankruptcy court." *Aiello v. Providian

Fin. Corp.*, 239 F.3d 876, 878 (7th Cir. 2001).  Absent action by the bankruptcy court, the stay

remains in effect until the case is closed, dismissed, or a discharge is granted.  11 U.S.C. §

362(c)(2).  The primary purpose of the automatic stay is to prevent the debtor's estate from

being picked over by creditors.  *Underwood v. Hilliard* (*In re Matter of Rimsat, Ltd.*), 98 F.3d

956, 961 (7th Cir. 1996).  This allows for the orderly distribution of assets through the

bankruptcy process and avoids a mad scramble for assets by creditors.  *Holtkamp v. Littlefield*

(*In re Matter of Holtkamp*), 669 F.2d 505, 508 (7th Cir. 1982).  The stay "prevents *all* pre-

petition creditors from taking *any* action to collect their debts." *Vitreous*, 911 F.2d at 1231

(emphasis added).  However, sometimes the stay merely delays the inevitable – i.e., that the

creditor will collect on his debt.  It is for "this reason, Congress included a provision for relief

from the automatic stay," which is found in § 362(d).  *Id*. at 1232.

Radcliffe asserts, and the Bankruptcy Court found, that International's conduct violated

the provision of the stay in § 362(a)(6).[4]  That section prohibits "any act to collect, assess, or

recover a claim against the debtor that arose before the commencement of the [bankruptcy

---

[4]  The Bankruptcy Court held that International's actions did not violate § 362(a)(7),
which specifically prohibits "the setoff of debt" owed by the debtor.  (*See* DE 1-7 at 21.)
Because this Court agrees that International's conduct violated § 362(a)(6), it need not discuss
the Bankruptcy Court's decision with respect to § 362(a)(7).

case]." 11 U.S.C. § 362(a)(6). It does not give the debtor a respite "from communication with creditors," but only "from the threat of immediate action by creditors." *In re Matter of Duke*, 79 F.3d 43, 45 (7th Cir. 1996) (quotation marks omitted).

International did more than "communicate" with Radcliffe. It informed him that his "monthly pension benefits will be offset against [his] debt to the Pension Fund until such time as the judgment has been satisfied," and it cited § 7.30(c) of the Plan and a Third Circuit case for authority to do so. (DE 1-9 at 7.) The letter went on to note that, even though Radcliffe had entered bankruptcy, International believed the threatened "offset of [his] pension benefits should not be affected by the bankruptcy" because the "pension assets are not property of the bankruptcy estate." (*Id*. at 8.) There can be no doubt that this constitutes "an act to collect, assess, or recover a claim against" Radcliffe. It was not a mere communication, nor even a threat that International might use Radcliffe's pension benefits to offset his debt. It was a clear statement that International was going to carry out the offset, regardless of the protections granted by the bankruptcy laws. More importantly, International did more than make statements of its intentions. It actually followed through and did not pay Radcliffe his benefits and did not seek the Bankruptcy Court's approval before taking such action.

International asserts that its letter did not violate § 362(a)(6) because it was not coercive or harassing, (*see* DE 6 at 39), but that is tough to swallow. International held all the cards. It possessed Radcliffe's pension benefits and it made a unilateral decision to not pay them. And it preemptively rejected the argument that the bankruptcy laws protected him. Then it chose not to seek court approval, leaving Radcliffe to fend for himself while it kept his benefits. International did not need coercive or harassing rhetoric to coax the money out of Radcliffe; they had the

money and planned on keeping it, effectively telling him to buzz off.  Even if done politely, that is not permitted by § 362(a)(6).  And while International would like to blame this situation on "Radcliffe's litigious bent," (DE 6 at 49), that ignores the fact that International put Radcliffe in this position by ignoring the bankruptcy laws.

International defends its actions by arguing that, first, the Bankruptcy Code does not restrict its right to offset Radcliffe's debt, and second, that it simply undertook an "administrative freeze" of Radcliffe's payments, which does not violate the automatic stay.  (*See* DE 6 at 40-41.)  The first is just incorrect; the second is a stretch.

As a general rule, the Bankruptcy Code does not restrict the substantive right to offset debt.  *See U.S. v. Maxwell*, 157 F.3d 1099, 1102 (7th Cir. 1998) ("The Bankruptcy Code neither expands nor constricts the common law right to setoff.").  The Code even states that expressly. *See* 11 U.S.C. § 553.  However, the Code also expressly states that the preservation of the right of setoff is subject to the restrictions in § 362.  *See id.* ("Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt. . . .").  Thus, while bankruptcy law does not restrict or expand the substantive right to setoff, it channels that right so that the bankruptcy court maintains control over the bankruptcy estate and the proceeding in general.

International points to *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995) to support its second argument: that it was not actually setting off Radcliffe's debt, but merely freezing it pending clearance by the Bankruptcy Court.  (*See* DE 6 at 40-43.)  Whether or not International actually carried out a setoff is a moot point because the Bankruptcy Court held International violated § 362(a)(6), not §362(a)(7).  (*See* DE 1-7 at 21.)  That largely undercuts

International's reliance on *Strumpf* which was only concerned with "whether the refusal [to pay] was a setoff."  516 U.S. at 19 (emphasis omitted).

However, this does not necessarily answer International's contention that its "[a]ction simply maintains the status quo pending judicial action on the setoff" and is "consistent with the Bankruptcy Code and does not constitute a violation of the automatic stay" even if a court ultimately determines that the "hold and offset claim were invalid."  (DE 6 at 41-42.)  But a comparison of the facts here with the facts in *Strumpf* answers that argument.  In *Strumpf*, a creditor temporarily withheld payment of a debt that it owed a bankrupt debtor.  516 U.S. at 17-18.  After refusing to pay, the creditor waited only *five days* to petition the bankruptcy court for relief from the automatic stay.  *Id*. at 18.  The Court – after concluding that the creditor's act did not constitute a setoff – expressly concluded that it was not a violation of § 362(a)(6) to temporarily refuse to pay a debt that is subject to setoff.  *Id*. at 21.

In contrast, here International *expressly* stated that it was going to withhold payments and that it was going to do so *despite* the bankruptcy case because it did not believe the bankruptcy laws applied to it.  (*See* DE 1-9 at 7-8.)  Then International refused to seek relief from the Bankruptcy Court until after Radcliffe filed his complaint.  In fact, International did not actively seek relief from the Bankruptcy Court until approximately six months later, and then only after prompting from the Bankruptcy Court.  (*See* DE 1-7 at 13.)  But even generously construing International's answer as sufficient to seek relief from the stay, that answer came two months after International's letter announcing its intent and well after International had missed its first payment to Radcliffe, and even then it was still in *response* to Radcliffe's complaint.  Quite simply, International's conduct reveals that it was not temporarily withholding payment so that it

12

could seek court approval.  *See In re Orr*, 234 B.R. 249, 255 (Bankr. N.D.N.Y. 1999) (noting

that the creditor "made no effort to seek relief from the automatic stay," but instead "elect[ed] to

supplant its judgment for that of the bankruptcy court," in concluding that a "two month long

administrative freeze . . . [is] more than a *temporary* refusal to pay") (emphasis in original).

Nothing in *In re Laux*, 181 B.R. 60 (Bankr. S.D. Ill. 1995) or *In re Briggs*, 143 B.R. 438

(Bankr. E.D. Mich. 1992) – cases upon which International relies – counsels a different result.

In *Laux,* the court determined that the creditor had not carried out a setoff when it temporarily

withheld payment so that it could seek relief from the court.  181 B.R. at 62.  And in *Briggs* the

bankruptcy court held that a letter seeking a reaffirmation agreement and announcing an

administrative freeze on five dollars did not violate § 362(a)(6) because it was neither likely to

significantly influence the debtor's decision regarding a $4,595 debt, nor something a reasonable

person would consider unfair under the circumstances.  143 B.R. at 454.  These cases are starkly

different from the present one because here International held all of the cards, announced its

intention, carried it out without seeking court approval, and left Radcliffe virtually no option but

to pursue litigation.  Thus, the Bankruptcy Court was correct in holding that International

violated 11 U.S.C. § 362(a)(6).

The next question is whether International's violation of the automatic stay was willful.

Section 362(h) only provides for damages for "willful" violations of the automatic stay.  11

U.S.C. § 362(h).  "A 'willful violation' [of § 362(h)] does not require a specific intent to violate

the automatic stay."  *Price v. U.S.* (*In re Price*), 42 F.3d 1068, 1071 (7th Cir. 1994).  Instead, it is

sufficient if the creditor acts despite awareness of the pending bankruptcy proceeding.  *See id.*;

*see also Roete v. Smith* (*In re Roete*), 936 F.2d 963, 965-66 (7th Cir. 1991) (the simple act of

cashing a pre-petition check with the knowledge that the check writer had entered bankruptcy protection "could be considered a willful violation of section 362(a)(6)," except that an amendment exempted negotiable instruments from the automatic stay).  As the Seventh Circuit has noted, "[t]he office of section 362(h) is . . . to protect the rights conferred by the automatic stay," including the protections afforded to other creditors.  *Aiello*, 239 F.3d at 880.  Where one creditor "muscle[s] out" other creditors, that violates the automatic stay.  *Id*.

Here International has used its unique position as the holder of both Radcliffe's debt and his pension payments to make sure that its debt would be paid.  While International's conduct might not have been at the expense of other creditors, that is for the Bankruptcy Court – not International – to decide.  *See* 11 U.S.C. § 362(d).  Simply reading through International's November 2 letter leaves little doubt that the Bankruptcy Court was correct in deciding that International willfully violated § 362(a)(6).  International was not only aware of Radcliffe's bankruptcy proceeding, it considered and rejected the notion that it was constrained by the automatic stay.  (*See* DE 1-9 at 8.)

Even if there were any question, Radcliffe's November 11 response also notified International of the bankruptcy proceeding and objected to International's plan.  International argues that its November 2 letter "simply explained the basis of its claim for a setoff and the mechanics of the setoff with an invitation to informal discussion or formal appeal to resolve any contrary claims," and that Radcliffe's response declined to appeal after "provid[ing] no substantive theory to entitle him to actual payment."  (DE 6 at 39.)  That reading is not very sensible; but it is beside the point anyway.  International was fully aware of the bankruptcy proceeding – both when it wrote the letter advising that it intended to carry out the setoff and

14

later when it withheld payment without seeking relief from the Bankruptcy Court.  Under

Seventh Circuit precedent, International acted willfully.  It may very well be that International

believed in good faith that the automatic stay did not prohibit its actions, (*see* DE 6 at 44-46), but

a good faith belief in one's position is not relevant to a determination of whether the violation

was willful.  *Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 268-69 (1st Cir. 1999).

**III.     WHETHER TO GRANT RELIEF FROM THE AUTOMATIC STAY**

Having decided that International violated § 362(a)(6), the next question for the

Bankruptcy Court was whether to grant International relief from the automatic stay.  To decide

that question, the Bankruptcy Court looked to ERISA to determine whether International even

had a right to divert Radcliffe's benefits to offset his debt.  (*See* DE 1-7 at 14.)  It held that

ERISA did not permit International to setoff Radcliffe's debt and, as a result, denied

International's request for relief from the automatic stay.  (*Id*. at 20-21.)

I review the Bankruptcy Court's decision regarding relief from the automatic stay for

abuse of discretion.  *See, e.g.*, *Meyer Med.*, 385 F.3d at 1041.[5]  There was no abuse of discretion

here.  Although it is not explicit in the text of § 362(d), it was perfectly reasonable for the

Bankruptcy Court to examine whether one has a legal right to carry out the act that violates the

automatic stay in order to determine whether to grant relief from the stay.  In this case, because

International is governed by ERISA, the bankruptcy court consulted ERISA law regarding

whether International had the right to offset Radcliffe's debt with his pension benefits.

_____

[5]  Contrary to International's contentions, the Bankruptcy Court did not venture out of its jurisdiction in deciding not to grant relief from the automatic stay.  (*See* DE 6 at 15-17.)  It was completely within the Bankruptcy Court's jurisdiction – and discretion – to grant or deny relief from the stay.  It simply (and wisely) chose to examine ERISA law in making that determination.

In reviewing the Bankruptcy Court's decision, I will first provide some background regarding ERISA and its anti-alienation provision.  Second, I examine International's argument that its action was, in fact, neither a setoff nor an alienation.  I then turn to International's argument that its setoff is exempt from the anti-alienation provision.  Finally, I address International's argument that it is merely invoking a contractual remedy as is permitted by the Seventh Circuit's decision in *Northcutt v. General Motors Hourly-Rate Employees Pension Plan*, 467 F.3d 1031 (7th Cir. 2006).

### A.    ERISA And The Anti-Alienation Provision

ERISA is a comprehensive statutory scheme designed to safeguard employment benefits.  "The principal object of the statute is to protect plan participants and beneficiaries." *Boggs v. Boggs*, 520 U.S. 833, 845 (1997).  To do so, "ERISA contains certain safeguards and protections which help guarantee the equitable character and the soundness of private pension plans." *Id*. (brackets omitted).  An ERISA plan holds assets "for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." *Id*. at 845-46 (quotation marks omitted).  *See also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002).

One of ERISA's protections is the so-called anti-alienation provision, which states that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1).  The provision reflects a Congressional judgment to safeguard a stream of income for pensioners and their dependants even if that policy choice prevents others from securing relief for wrongs done them. *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376 (1990).

16

The "anti-alienation provision is mandatory and contains only two explicit exceptions," which are contained in §§ 1056(d)(4) and (d)(3)(A), *Boggs*, 520 U.S. at 851, neither of which apply here.  Similarly, there is no "equitable" exception to the anti-alienation rule.  *See Guidry*, 493 U.S. at 376.  *See also In re Matter of Baker*, 114 F.3d 636, 640 (7th Cir. 1997).  That leaves only two options for International to avoid the anti-alienation provision: claim that its conduct was not a setoff at all, or claim its setoff was exempt from the anti-alienation provision.

### B.      Whether International Seeks A Setoff Or Alienation Under § 1056

As an initial matter I must decide whether what International sought to do was even a setoff or alienation under § 1056 in the first place.  International answers the question "no" because the payments are only between the ERISA-covered plan and its beneficiary, as opposed to one that also includes a third party.  (*See, e.g.*, DE 6 at 38.)  It contends – relying on *Coar v. Kazimir*, 990 F.2d 1413 (3d Cir. 1993) – that an "action by a plan to offset plan debts against plan benefits" is not an assignment or alienation under § 1056 because "alienation . . . refers to actions by third parties, such as a beneficiary's employer or creditors, and not . . . a recoupment by the pension plan."  (DE 6 at 29 (quotation marks and brackets omitted).)  *Coar* held that § 1056(d)(1) shields only the "beneficiaries' interest under the pension plan from third-party creditors."  990 F.2d at 1420-21.  The Bankruptcy Court rejected this contention, noting that there is no statutory restriction "to solely third party creditors."  (DE 1-7 at 19.)  The Bankruptcy Court's reading is correct.

First, the Third Circuit has expressly limited the reach of *Coar*.  The court has since noted that *Coar* was based on the pre-1997 amendment language in § 1056(d), which it held conflicted with a statutory right to recover for a breach of a fiduciary duty.  *See Martorana v. Bd.*

17

*of Trs. of Steamfitters Local Union 420 Health, Welfare & Pension Fund*, 404 F.3d 797, 802 (3d

Cir. 2005).  Indeed, the decision in *Coar* was issued prior to the 1997 amendments adding §

1056(d)(4).  *See* Pub. L. 105-34, § 1502(a) (Aug. 5, 1997).  Thus, *Martorana* concluded that, in

the face of the 1997 amendments, which "specifically allow for the set-off of pension benefits in

several specific situations," it would "refuse to craft another exception to [the anti-alienation

provision] where Congress has not recognized one."  404 F.3d at 804.

Second, a straight-forward reading of § 1056(d)'s post-1997 amendment prohibition on

alienation is not limited to setoffs in favor of third parties.  There is nothing within subsection

(d)(1) suggesting the prohibition is so limited.  *See* 29 U.S.C. § 1056(d)(1) ("Each pension plan

shall provide that benefits provided under the plan may not be assigned or alienated.").

Moreover, other provisions of the same section provide that alienation of certain amounts, which

are retained by the pension plan, do not violate (d)(1).  *See* 29 U.S.C. § 1056(d)(2) (expressly

allowing "assignment or alienation made for the purpose of defraying plan administration

costs").

Similarly, International's reliance on "authoritative governmental agencies," which it

claims "have concluded that the recovery of debts is simply an accounting measure" rather than

an alienation, is misplaced.  (DE 6 at 31.)  Under International's theory, "a person who owes the

plan money is simply treated as having been paid in advance and is not entitled to payment until

there is a net balance from the Plan."  (*Id*. at 31-32.)  But the two agencies upon which

International relies state this position with respect to recovery of benefit *overpayments*.  *See*

Dept. of Labor ERISA Op. No. 77-08, 1977 WL 5394 (E.R.I.S.A.) (responding to a question

regarding a fund's "authority to seek recoupment" where there has been "a net overpayment");

26 C.F.R. § 1.401(a)-13(c)(2)(iii) (providing that the terms "assignment" and "alienation" do not include "[a]ny arrangement for the recovery by the plan of *overpayments* of benefits previously made to a participant") (emphasis added).

What these regulations are getting at is the following situation: suppose a plan overpaid a beneficiary by $100 a month for two years. The plan would be out $2400 in this scenario. It would not be an offset to withhold future payments until the $2400 was paid off since this would merely be a recoupment of overpayments. But that's not at all what International sought to do here. International wasn't recouping an overpayment; it never overpaid Radcliffe in the first place. So what International did plainly amounts to an offset under § 1056(d).

## C.     Exemption Under § 1056(d)(4)

Section 1056(d)(4) exempts certain offsets from its ban on alienation. International claims that what it was attempting to do falls within the exemption, and so that is what I explore next. Here is the pertinent language from the statute:

> [The prohibition on alienation] shall not apply to any offset of a participant's benefits provided under an employee pension benefit plan against an amount that the participant is ordered or required to pay to the plan if–
>> (A) the order or requirement to pay arises–
>>> (i) under a judgment of conviction for a crime involving such plan, [or]
>>> (ii) under a civil judgment (including a consent order to decree) entered by a court in an action brought in connection with a violation (or alleged violation) of part 4 of this subtitle [section 1101 et seq. of this title] . . . [and]
>> (B) the judgment, order, decree, or settlement agreement expressly provides for the offset of all or part of the amount ordered or required to be paid to the plan against the participant's benefits provided under the plan. . . .

29 U.S.C. § 1056(d)(4).

19

Radcliffe was not convicted of a crime involving International.  Nor does the D.C. default judgment "expressly provide for the offset."  Thus, as a straight-forward matter of statutory interpretation, International does not meet the requirements for the § 1056(d)(4) exemption.

International nevertheless argues that "[t]he case law uniformly allows such offsets and has rejected claims that [setoffs] violate[] the anti-assignment rule."  (DE 6 at 30-31.)  But the cases upon which International relies all involved either an overpayment or a breach of a fiduciary duty.  Indeed, in the case International relied upon in its November 2 letter, *Coar v. Kazimir*, the plan beneficiary had been both convicted of a RICO conspiracy regarding his administration of the fund and found civilly liable for a breach of his fiduciary duties to the tune of $25 million.  990 F.2d at 1414.  As the Third Circuit later explained, its holding in *Coar* regarding the availability of relief was driven by the fact that there was "deliberate, criminal behavior by a plan fiduciary which led to depletion of the fund."  *Martorana*, 404 F.3d at 803.

In this case, there was no allegation that Radcliffe breached his fiduciary duty to International in the D.C. complaint; instead, it essentially stated a breach of contract claim against him.  (*See* DE 1-27 at 2-13.)  And the D.C. default judgment is devoid of any reference to Radcliffe's alleged fiduciary duty.  (*See* DE 1-28 at 3-5.)  In short, the default judgment giving rise to Radcliffe's debt did not meet the requirements of subsection (A)(ii).

International counters by arguing "that the debt was substantively a fiduciary debt under the principles that would have been asserted in the absence of the settlement with the personal guaranty," and that therefore holding that it is not a debt arising from a breach of a fiduciary duty exalts form over substance.  (DE 6 at 16 n.5; *see also* 32 n.13.)  But this argument is blocked by

the plain language of § 1056(d)(4)(A)(ii), which requires a civil *judgment* based upon a violation

of part 4 of the subtitle.  And even if International's complaint did concern a breach of

Radcliffe's fiduciary duty (which it plainly did not) it would still lack the requisite language in

the default judgment order to satisfy (A)(ii).

At bottom, I am not going to evaluate claims International *might* have had against

Radcliffe but chose not to bring.  The question before me is simply whether the Bankruptcy

Court abused its discretion by not granting International relief from the automatic stay.  It would

be senseless to apply the exemption under § 1056(d)(4)(A)(ii) based on *possible* claims that

International asserts it *might* have brought instead of evaluating the claim it actually did assert.

In sum, what International did was an alienation of Radcliffe's funds.  And

International's actions did not fall within the exemption to that rule.  The Bankruptcy Court was

therefore correct in holding that International was not entitled to relief from the automatic stay.

**D.      Contractual Recoupment Of Overpayment In *Northcutt***

Having no other avenue to avoid the anti-alienation provision, International raises a new

argument on appeal which concerns a 2006 Seventh Circuit decision, which it says "was missed

by the parties and Bankruptcy Court . . . but is controlling authority that rejects the Bankruptcy

Court's holding and judgment."  (DE 6 at 21-22 (citing *Northcutt*, 467 F.3d 1031).)  According

to International, "*Northcutt* is fatal to the Bankruptcy Court's analysis" because it allowed an

offset that was specifically provided for in the contract between the GM pension plan and its

participants.  (DE 6 at 28.)  "It directly rejected implied limits on the recovery of *contractual*

debts due a plan," and held that the limits on judicial remedies found in ERISA do not apply to

*contractual* remedies provided by the plan documents.  (*Id*. (emphasis added).)  International

then says that it, like the plan in *Northcutt*, is simply invoking the contractual remedy in §

7.30(c).

As an initial matter, International waived this argument by not raising it in the

bankruptcy court.  *See In re Matter of Geraci*, 138 F.3d 314, 321 (7th Cir. 1998).  But even on

the merits, International's argument misses the mark; *Northcutt* has no application here.

*Northcutt* involved a pension plan's right to recoup an overpayment.  467 F.3d at 1032.

There, the plan paid disability benefits to the beneficiary, but he later received social security

disability benefits.  *Id*. at 1033.  The beneficiary's contract with the plan required that the

beneficiary repay the resulting overpayment and empowered the plan to recoup the overpayment

by withholding future payments.  *Id*. at 1032-33.  So when the beneficiary did not repay the

overpayment, the plan took advantage of its contractual remedy to recoup it.  *Id*.  The beneficiary

sued, claiming that the plan had violated ERISA.  *Id*. at 1032.

The Seventh Circuit held that the contractual provision for recoupment of an

overpayment was permitted under ERISA.  The Seventh Circuit noted that prior Supreme Court

cases, such as *Great-West*, 534 U.S. 204, dealt with statutory restrictions on certain *judicial*

remedies.  *Northcutt*, 467 F.3d at 1037.  Those cases "simply do not address contractual

reimbursement schemes," like the one presented in *Northcutt*.  *Id*.  The Seventh Circuit noted

that a "great concern" of ERISA is "to ensure the integrity of written plans, and to enforce them

as written."  *Id*. at 1038.  Consequently, the Seventh Circuit determined, there is an "important

role" for "reimbursement of overpaid plan benefits . . . in the continuing viability of plans for all

other beneficiaries," which is "an equally important ERISA goal."  *Id*.  In other words, ERISA,

and the Supreme Court's interpretation of it, did not specifically prohibit contractual provisions

allowing a plan to *recoup an overpayment of benefits*.  Therefore, the court allowed the plan to invoke its contractual remedy to recoup the overpayments in order to support ERISA's goal of insuring that other beneficiaries would receive their benefits.

As discussed earlier, International does not seek to invoke a contractual remedy to recoup an overpayment.  As International explained in its November 2 letter to Radcliffe, it is attempting to invoke § 7.30(c) of the pension plan contract.  (*See* DE 1-9 at 7.)  That section provides that the plan's benefits may not be assigned or alienated except:

> the prohibition on assignment and alienation shall not apply to an offset or other recovery by the Plan, pursuant to a criminal conviction, civil judgment, or settlement agreement as provided in IRC 401(a)(13)(C) and (D).  Unless prohibited by law, the remedy in IRC 401(a)(13)(C) and (D) shall not preclude any other or greater right of offset or recovery by the Plan allowed by ERISA or its common law.

(DE 1-31 at 1.)  This section makes no reference to recouping overpayments; it is simply a restatement of the law under 29 U.S.C. § 1056(d)(4).  Section 401(a)(13)(C) and (D) of the Internal Revenue Code are likewise restatements of § 1056(d)(4).  Thus, unlike the contractual provision in *Northcutt*, § 7.30(c) is not a contractual provision for the recoupment of overpaid benefits.  So payment here would not further ERISA's "great concern . . . to ensure the integrity of written plans, and to enforce them as written."  *Northcutt*, 467 F.3d at 1038.

Even if the plan documents permit, as International argues, International to "offset future benefits by any overpayments or other amounts [Radcliffe] owe[s] the Plan," (DE 6 at 26 (quotation marks omitted)), International has not overpaid Radcliffe.  All of the cases cited by International involved a situation where the plan overpaid the beneficiary and then later sought recoupment.  Unlike in those cases, including *Northcutt*, International did not pay Radcliffe a benefit that was later determined to be one to which he was not entitled.  *See Northcutt*, 467 F.3d

at 1033; *see also Eubanks v. Prudential Ins. Co. of Am.*, 336 F. Supp. 2d 521, 532 (M.D. N.C. 2004) (beneficiary was paid more than the amount to which she was entitled because the plan erroneously coded her as a salaried employee rather than an hourly employee and because she later received a retroactive Social Security disability benefit); *Tucker v. Gen. Motors Ret. Program*, 949 F. Supp. 47, 48-49 (D. Mass. 1996) (recoupment of early retirement benefits which were paid even though the beneficiary allegedly did not keep his annual income below a required threshold); *Stuart v. Metro. Life Ins. Co.*, 664 F. Supp. 619 (D. Me. 1987) (recoupment of benefits after beneficiary received retroactive Social Security payment).

In sum, International is not seeking to *recoup* benefits it has already paid out; it is seeking to obtain the contributions Radcliffe owes International via a distinct contract. Therefore, *Northcutt* is not controlling.  As noted above, ERISA prohibits setoffs except in certain, very specific situations.  That provision "reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners . . . even if that decision prevents others from securing relief for the wrongs done them."  *Guidry*, 493 U.S. at 376. Congress has made this decision and it is not for me to second-guess it.

## IV.    DAMAGES

Having determined that International violated the automatic stay and is not entitled to retroactive relief from it, the next issue is damages.  International disputes the Bankruptcy Court's calculation.  The Bankruptcy Court held International liable for compensatory damages in the amount of pension benefits withheld between September 2005 and January 2006 plus interest, attorney's fees, and $10,000 in punitive damages.  (DE 1-7 at 31-32.)  A bankruptcy

court is empowered to award these types of damages to enforce the automatic stay under § 362(h).  But International now challenges the Bankruptcy Court's calculation.

In a rather lengthy, substantive footnote, International asserts the Bankruptcy Court erred in its calculation of both the amounts owed to Radcliffe and the interest rate to be applied to those amounts.  (*See* DE 6 at 49-50 n.16.)  First, International argues that the Bankruptcy Court erroneously included the monthly benefit payments for the months of September and October 2005.  (*Id.*)  It contends that, had it made those payments on time, the cash from those payments would have become property of the estate when Radcliffe filed for bankruptcy on October 13, 2005.  (*Id.*)  The problem with this argument is that we are not dealing with cash that was in the estate at the time Radcliffe filed for bankruptcy.  Instead, we are dealing with a right to payment that Radcliffe possesses via his pension.  The right to payment under ERISA is not part of the bankruptcy estate.  *See Patterson*, 504 U.S. at 759-60.  Therefore, the Bankruptcy Court did not err in including the September and October 2005 payments in its calculation of damages.

International next argues that the Bankruptcy Court used an incorrect interest rate to calculate the amount of interest due Radcliffe on the compensatory damages.  (*See* DE 6 at 49-50 n.16.)  According to International, if it owes Radcliffe any payment, it is by virtue of ERISA and therefore the amount should be subject to the interest rates governing delayed ERISA payments rather than the higher rate for bankruptcy payments.  (*Id.*)  International's argument forgets the posture of this case.  Radcliffe did not file a complaint under ERISA; he filed an adversary complaint in bankruptcy.  The Bankruptcy Judge held that International violated § 362(a)(6) under *bankruptcy* law.  The Bankruptcy Judge then referred to ERISA to determine whether to grant International relief from the automatic stay, again under bankruptcy law.  The Bankruptcy

25

Judge's reference to ERISA did not transform this case into an ERISA one; it is still an adversary complaint in bankruptcy and therefore subject to the interest rates provided by the bankruptcy regime.  The Seventh Circuit generally uses the prime rate, like the Bankruptcy Court did here, to calculate prejudgment interest.  *See First Nat'l Bank of Chi. v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999); *see also Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998).  The Bankruptcy Court therefore applied the correct interest rates in its damages calculation.

As for the award of punitive damages, International claims that such awards should be reserved for conduct with "a malevolent intent or a clear disregard and disrespect of the bankruptcy laws," and that they are not appropriate for conduct that is only "deliberate."  (DE 6 at 50-51 (quoting *Vazquez v. Sears, Roebuck & Co.* (*In re Vazquez*), 221 B.R. 222, 231 (Bankr. N.D. Ill. 1998)) (quotation marks omitted).)  International then contends that it merely avoided "a duplicative motion" in favor of attempting to limit legal fees.  (*Id*. at 51.)  From its perspective, "a punitive damages award sanctioning a defendant for NOT needlessly multiplying proceedings and attorney fees would itself shock the conscience and not serve the ends of justice."  (*Id*.)

I have not found a definitive articulation in the Seventh Circuit of the standard of review for an award of punitive damages under § 362(h).  Most other courts have applied some version of a highly deferential review.  *See, e.g.*, *Knupfer v. Lindblade* (*In re Dyer*), 322 F.3d 1178, 1191 (9th Cir. 2003) (applying an abuse of discretion standard for the award and a clear error standard for the underlying factual findings); *Citizens Bank of Md. v. Strumpf* (*In re Strumpf*), 37 F.3d 155, 159 (4th Cir. 1994) (reviewing a bankruptcy court's punitive damages award for abuse of

discretion), *rev'd on other grounds*, 516 U.S. 16 (1995); *Lovett v. Honeywell, Inc.*, 930 F.2d 625, 628-29 (8th Cir. 1991) (reviewing a bankruptcy court's punitive damages to determine if it was clearly erroneous, but also requiring a finding of "egregious circumstances" as a prerequisite for the award).  One district court within the Seventh Circuit has applied *de novo* review, but did so without citing any authority for that proposition.  *See In re Matter of Winters*, No. 93-7381, 1995 WL 453053, *7 (July 28, 1995).

I conclude that my review of the Bankruptcy Court's award of punitive damages here should be deferential.  This conclusion is primarily based on the text of the statute itself.  It provides that the "individual injured by any willful violation of [the automatic stay] . . . *in appropriate circumstances*, *may* recover punitive damages."  11 U.S.C. § 362(h) (emphasis added).  The italicized language grants the bankruptcy court significant discretion in the award of punitive damages.  That, in combination with the deferential review generally given to a bankruptcy court's determinations regarding relief from the automatic stay, convinces me that the "abuse of discretion" standard used in the cases mentioned above is appropriate.

The Bankruptcy Court found that, in the face of the automatic stay that International knew was in effect, International chose to do *nothing* to clear its proposed setoff with the Bankruptcy Court because it had a theory about the applicability of the stay.  (DE 1-7 at 28-30.)  Indeed, the Bankruptcy Court concluded that this autocratic decision was "egregious" and "cavalier" and "require[d] deterrence."  (*Id*. at 30 (quotation marks omitted).)  According to Judge Klingeberger, International forced Radcliffe to take the initiative, convincing him that "if Radcliffe had not filed this adversary proceeding, International would have undertaken no affirmative action whatsoever to seek relief from the stay."  (*Id*. at 30.)

27

International's decision to ignore the stay and force Radcliffe to take action required punishment in Judge Klingeberger's view.  Hence the award of punitive damages in the sum of $10,000.  It's a bit ironic that the person who stiffed the fund would be allowed to not only receive his own benefits but be rewarded with a $10,000 windfall to boot.  But Judge Klingeberger balanced that concern against the need for deterrence and concluded that deterrence was necessary for those who willfully violate the stay.  While I may have arrived at a different conclusion as it relates to punitive damages had I been deciding the case in the first instance, Judge Klingeberger's decision was well within the bounds of the discretion vested in him under § 362(h).

## CONCLUSION

The Bankruptcy Court's July 19, 2007 Order is **AFFIRMED**.

**SO ORDERED**.

ENTERED: July 8, 2008

<u>s/ Philip P. Simon</u>
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT